## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**MARILU ROCHE,**

Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY,**

Defendant.

Civil No. 19-1298 (BJM)

## OPINION AND ORDER

Marilu Roche ("Roche") seeks review of the Social Security Administration Commissioner's ("Commissioner's") finding that she is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Roche contends that the administrative law judge ("ALJ") improperly evaluated the medical evidence and erred in making the residual functional capacity ("RFC") determination. Docket No. ("Dkt.") 22. The Commissioner opposed. Dkt. 26. This case is before me by consent of the parties. Dkt. 6-7. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could

justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the ALJ assesses the claimant's RFC and determines at step four whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience. If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability. *Santiago v. Secretary of Health &*

*Human Services*, 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform.  *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of his insured status, or her date last insured.  *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Roche was born on July 30, 1972, does not understand the English language (communicates in the Spanish language), has an associate degree, and worked as a mortgage loan interviewer and teller. On June 16, 2014, Roche applied for disability insurance benefits, claiming to have been disabled since July 9, 2013 (onset date) at age 40[1] due to fibromyalgia, hearing loss, lack of balance, back condition, bursitis, neuropathy, and an emotional condition. Roche met the insured status requirements of the Act through December 31, 2018. Tr. 20, 22, 28, 40, 66, 412, 427-431, 440.

*Physical conditions:*

**Dr. William Santiago (otolaryngologist)**

Notes by Dr. Santiago from March, April, and July 2011, and June 2012 indicate that Roche was suffering from vertigo, headaches, distorted vision, bilateral face swelling, temporomandibular and ear discomfort, sore throat, tonsils swelling, difficulty swallowing, and nausea. Roche suffered a fall in May 2012. Romberg test was positive. Medications were prescribed. Roche was instructed not to drive or work. Notes from January and May 2015 indicate that Roche still had these symptoms. Tr. 489-503.

**Dr. Ramon del Padro (neurosurgeon)**

In May 2012, Dr. del Padro performed lumbar back surgery (laminectomy) on Roche for her left herniated nucleus pulposus ("HNP") L4-L5. Notes indicate that Roche had a large extruded

---

[1] Roche was considered to be a younger individual (Tr. 28), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

disc fragment removed.  Tr. 747-749, 752. Post-surgery notes from June 2012 show that Roche felt discomfort and numbness (hypoesthesia) around her left L5, and had headaches. Deep tendon reflexes ("DTR") were normal and showed no weakness. She could easily tolerate straight leg raising ("SLR") to 90 degrees bilateral, with moderate limitation of lumbosacral range of movement ("ROM"). Tr. 751, 758.

In September 2012, Roche felt low back pain irradiating to her lower left extremity and cramps and was taking medications. She was no longer feeling hypoesthesia. Dr. del Padro diagnosed displacement of intervertebral disc site unspecified without myelopathy, unspecified acquired hypothyroidism, and unspecified nonpsychotic mental disorder. Tr. 751-756.

In January 2014, Roche suffered another fall. She felt pain, cramps, and polyarthralgia, and was taking medications. Roche tolerated SLR to 90 degrees bilateral with moderate limitations and no weakness or numbness. Dr. del Prado diagnosed displacement of intervertebral disc site unspecified without myelopathy, unspecified acquired hypothyroidism, and unspecified nonpsychotic mental disorder. Tr. 667-668, 756.

In May 2014, Roche experienced face swelling and pain, headaches, and all-over pain in her body. Dr. del Padro noted no new neurological findings but noticed that Roche was "[t]oday behaving somewhat strange." He prescribed medication for her depression and crying spells, and referred Roche to Dr. Pedro Berrios, stating that "[o]ur patient seems to be developing an emotional disorder." The referral further states that "[s]he is also complaining of swelling in face, joints, etc. Consider referring to Rheumatologist." Tr. 667-671, 757.

 Follow-up notes from February 2015 show that Roche was frequently falling due to vertigos. Her lower back pain had not improved with physical therapy and she felt pain in all areas of her body. Tr. 672-673. An MRI performed in May 2015 revealed minimal post-surgical changes of the L4-L5, with possible inflammatory changes in both plates. A videonystagmography (test for inner ear and central motor functions) performed in June 2015 showed no vestibulopathy. Tr. 676.

**Dr. Pedro Berrios (family medicine)**

In February 2014, Dr. Berrios diagnosed Roche with anxiety and fibromyalgia. Dr. Berrios prescribed pain and anti-inflammatory medications and referred Roche to physical therapy. Tr. 760. Dr. Berrios's notes from July, October, and December 2014, and January and February 2015 are illegible. Tr. 659-661, 762-767. February 2014 progress notes from Dr. Alberto Rivera (see

below) indicate that Dr. Berrios injected Roche in her lumbar spine with moderate pain results. Tr. 521.

A June 2014 MRI of the lumbar spine shows mild posterior disc bulge at the L1/L2 level, post-operative left hemilaminectomy at L4/L5 level, a partially desiccated L4/L5 with mild broad based posterior disc bulge, mild facet joint arthropathy, and mild type II degenerative end plate changes. Tr. 662. A June 2014 x-ray of the lumbar spine showed straightening of the normal lordotic curve and moderate degenerative disc disease at the L4/L5 level with moderate narrowing of the disc space. Tr. 663. A lumbar spine MRI performed in May 2015 showed degenerative changes of the lumbar spine with desiccation and disc space narrowing at the L4/L5 level causing mild bilateral foraminal stenosis, and endplate marrow changes suggestive of an inflammatory process. Tr. 664, 768. A plain radiograph of the cervical spine, performed in July 2015, shows multilevel spondylosis and degenerative disc disease. Tr. 678, 770.

**Dr. Alberto Rivera (physiatrist)**

February 2014 progress notes indicate that Roche's main complaint was lower back pain. She had fallen twice in the last six months and had since been feeling bilateral lower limb radicular symptoms. Roche described her pain as aching, acute, and with a severity intensity level of six out of ten. Her pain felt worst while walking and with prolonged standing. Dr. Rivera noted that Roche was very anxious. Dr. Rivera found that the Lasegue's Test and Slump Test were positive for right and left, and the Spurling's Tests were absent on the right and left. Roche had paraspinal spasms on her lumbar spine. All her muscles showed 4/5 strength. Lumbar spine extension was at 15 degrees, and lumbar spine flexion was at 65 degrees. A lumbar spine x-ray report showed minimal dextroscoliosis of the lumbar spine, no evidence of fracture or subluxation, and normal bone density. Dr. Rivera noted that all other systems were normal, but that she was very anxious. Dr. Rivera diagnosed postlaminectomy syndrome of lumbar region, and prescribed medications and lower back physical therapy in order to ultimately have her ambulate with no discomfort or pain; increase flexibility, mobility, ROM, and strength; and have no pain-related insomnia. Roche was instructed to use proper lifting techniques and maintain proper posture, to avoid bending at the waist, and to follow an exercise program. Tr. 521-525.

In April 2014, Dr. Rivera diagnosed myalgia and myositis unspecified, postlaminectomy syndrome of the lumbar region, cervicalgia, and thoracic spine pain. Roche stated that the medications were giving her moderate pain relief, but that she was alternating the pain medications

because Percocet gave her too much somnolence. She also tried physical therapy, but her symptoms exacerbated. Dr. Rivera added alternative medicine measures to her prescribed medications, such as intake of natural supplements, and referred Roche to hypnotherapy with Dr. Quesada. Tr. 517, 519. Dr. Rivera stated: "In my medical opinion patient is not fit for job related activities." Tr. 517.

In June 2014, Roche described her pain intensity as an eight out of ten, exacerbated with movement, and was worse with overhead activities and neck extension. This progress note indicates that Roche was "recently denied partial psychiatric hospitalization by her insurance. Patient is having cognitive impairment (fibrofog), forgetting driving destinations, with flight of ideas as well as persistent generalized pain." Dr. Rivera added under psychiatric symptoms: depression, memory change, mood swings, sadness. All other notes are the same as those of February 2014. Tr. 515-516. Dr. Rivera again stated: "She is unfit for job related activities." Tr. 518.

An electrodiagnostic study performed August 2014 revealed evidence of chronic left L4 and L5 radiculopathy. Tr. 590.

Notes from September 2014 show that cervical spine extension was at 35 degrees and flexion at 45 degrees. Lumbar spine extension was at 10 degrees and flexion was at 35 degrees. Roche was encouraged to follow a strict anti-inflammatory diet. Tr. 563-564. Notes from that day, and from January 2015 indicate that the Lasegue's Test and Slump Test were negative for right and left (they had been positive back in February 2014), and the Spurling's Tests were absent on the right and left. Roche still had paraspinal spasms on her lumbar spine, and also on her cervical and thoracic spine. She had more than eleven tender points. All her muscles showed 4/5 strength. Upon sensory exam, Roche presented intact sensation in her upper and lower limbs. Tr. 559, 563.

By February 2015, Roche still complained of exacerbated axial lumbar spine pain, which she described as aching, electrical, radiating, and with a severity or intensity level of eight out of ten. It was worse with walking and prolonged standing and impaired some of the activities of daily living. Roche was instructed to not bend at the waist. Dr. Rivera prescribed medications and scheduled a bilateral L4-L5, L5-S1 medial branch nerve diagnostic block. Dr. Rivera's notes also indicate that, if the pain did not decrease, he would perform radio frequency lesioning. Tr. 588-589.

Dr. Rivera stated in a medical certificate dated April 21, 2017, states he had treated Roche for chronic pain for more than seven years. "Her chronic low back pain interferes with activities of daily living that may include bending of the waist, preparing meals, prolonged standing or ambulation. She also uses opiate medications on a as needed basis to control her pain as well as interventional pain procedures." Tr. 832.

**Dr. George Fahed (sleep medicine, pulmonary and critical care physician)**

Dr. Rivera referred Roche to Dr. Fahed, who evaluated her on June 8, 2015, and diagnosed asthma. Her physical exam was normal, but the notes state that Roche looked sad, was oriented (to time, place, and person), and that medications were leading to positional vertigo. Tr. 665-666.

**Dr. Carlos Dominguez-Miranda (family medicine)**

Dr. Dominguez treated Roche from December 2015 to September 2016 for fibromyalgia and low back pain with medications. She presented pain in her wrists, legs, and arms. Amongst the diagnoses in this record are lumbar region spondylosis, fibromyalgia, an encounter for screening for malignant neoplasm of colon, candida otitis externa, urinary tract infection, and tension headache. Dr. Dominguez noted in his review of all physical systems that Roche presented anxiety and depression. Dr. Dominguez referred Roche to Dr. Alberto Rivera for pain management.

**Dr. Rafael Caballero (otolaryngologist)**

Dr. Caballero saw Roche on March 2017 for dizziness. He prescribed medications and referred Roche for treatment for vestibular dysfunction. Tr. 825-827.

**Dr. Reinaldo Carreras (neurologist)**

A progress note from April 2017 shows that Roche still suffered from migraine headaches and fibromyalgia. Dr. Carreras circled symptoms in practically every physical system reviewed. She still had signs of tinnitus, hearing loss, and vertigo. Roche was wheezing, and had chest pain, palpitations. She had nausea, vomiting, epigastric pain, and urinary retention. She had muscle spasm, dizziness, weakness, numbness. And she showed signs of anxiety, depression, and memory loss. Medications were prescribed. Tr. 829-830.

*Emotional conditions*

**Dr. Ruben Rivera-Carrion (psychiatrist)**

Dr. Rivera reported to the Disability Determination Program on July 27, 2014 that he treated Roche eight times, starting on October 2011 through July 2014, for major depression and

pain syndrome, but not during the year 2013. Tr. 95, 507, 533. Dr. Rivera diagnosed Roche with depressive bipolar disorder with psychotic signs, and pain disorder. Her Global Assessment of Functioning ("GAF")[2] was at 51. Prognosis was poor. Roche could handle funds. Tr. 115-116, 538-539.

In summary, Roche felt anxious and depressed, sad, unhappy, frustrated, anguished, irritable, forgetful, impotent, and emotionally empty. She was oriented in person, place, and time. She cried a lot, suffered from insomnia, and would socially isolate. At work, she had poor concentration and poor tolerance to stress. She lacked energy, motivation, and interest. Her sadness and desperation could interfere with her daily routine. She had visual and auditory hallucinations. Roche also had ideas of death ("'I should not exist. I don't want to be in this world'"). Tr. 110-114, 533-537.

Her physical pain did not allow her to improve her mental condition. "It is for this that the patient presents a cycle of depression/pain; pain/depression; when the pain increases the depression and the depression makes the pain worse. The pain in this patient produces a lack of concentration, memory, attention, mental flexibility, lack of adequate response to connective tasks and in executing structured tasks." Tr. 111, 534. "The pain has caused the patient a state of anguish and deterioration in the areas of social, workplace and family functioning." Tr. 112, 535.

As to her memory, attention, concentration, task persistence, and stress tolerance, the report recounts that Roche stopped working as a loan promoter in a bank because her pain caused that she could not complete a workday, and she felt pressured to perform work as she did before. "Also because of her pain she could not complete her day of work since she had become much slower there and they pressured her a lot to perform the work that she did before and like she did it before." She suffered a crisis while at work, and ran off, wanting to throw herself under a car or truck. Roche used to get along well with her co-workers, supervisors, and clients, but could no longer concentrate, tolerate stress, persist in tasks, or interact with people because of her low stress tolerance to new situations. She had difficulty making decisions, tolerating stress while completing tasks, and tolerating criticism. Her judgment and insight were poor. Tr. 114, 537.

---

[2] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.'" *Hernández v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 n. 1 (D.P.R. 2013) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*-IV 32 (4th ed. text rev. 2000) ("DSM–IV–TR")).

As to Roche's activities of daily living, she lived with her husband, two daughters and a son. She did not perform housework. House chores were done by her husband and daughters. As to social functioning, Roche lost her ability to initiate social contact, participate in group activities, and react appropriately in situations of stress. She did not tolerate people or sounds, and did not like having visitors at her house. She was afraid of her hallucinations. With psychiatric treatment and psychotherapy, Roche was trying to control her anxiety, regulate her sleep pattern, and control her depressive symptoms. Tr. 115, 538.

**Dr. Maria C. Quesada-Roig (clinical psychologist)**

Roche was referred to Dr. Quesada by Dr. Alberto Rivera for hypnotherapy. Tr. 517. Notes from April 8, 2014 are illegible (see copies of the record in the Spanish language and their respective translations at Tr. 97-102, 508-513).

**San Juan Capestrano Hospital**

Roche was partially hospitalized for psychiatric treatment from July 9 to 16, 2014. Roche was diagnosed with severe recurrent major depression, with a GAF score of 50. Medications were prescribed (Zoloft, Temazepam, Clonazepam). Clinical prognosis was reserved. Tr. 103-105, 112, 526-528. Roche listed as stressors that put her in emotional risk her physical, labor, and family problems. In her list of things to do to keep herself safe and healthy, she listed eating healthy, drinking water, taking her medications, and doing exercises. When asked to write what her support person could do for her, Roche answered to continue giving her support. Tr. 103-109, 526-532.

Roche was again partially hospitalized from February 3 to 10, 2015, for major severe recurrent depression and prescribed medications. Clinical prognosis was reserved. Roche listed her stressors as not being able to control her impulses, her economic situation, and her severe pain for which she could not find relief. In her list of things to do to keep herself safe and healthy, she listed not having a solution, being in a corner crying, taking pills and sleeping, and telling her husband and children that her husband would take care of them in her absence. When asked what her support person could do for her, Roche answered "[n]othing, if I can't find a solution to my life. If I haven't found a cure for my conditions and pain." Tr. 134-138, 565-569.

**INSPIRA Behavioral Care**

Roche was hospitalized from July 24 to 28, 2014 for major depressive affective disorder and a GAF score of 30 (Tr. 172-205, 679-712), and again from August 12 to 16, 2014. The check-marked issues to be reduced or resolved were: suicidal/homicidal ideas, profound sadness with

frequent crying, anger, fluctuations in mood, anxiety, irritability, lack of tolerance to frustrations, agitation/restlessness, lack of energy, poor concentration, irrational thoughts, difficulty making decisions, and visual and auditory hallucinations. Treatment would include orientation for the effective management of symptoms and problem solving. One other primary focus was to monitor her high-risk suicidal psychosis. Her resources and strengths included that Roche recognized her precipitating factors and need for psychological help, her spiritual strength, and her family support. Notes show that Roche was oriented and logical, but had decreased insight and judgment. Roche's attitude towards treatment was cooperative, superficial, dramatic, and somatic. She was offered individual, group, and family treatment. Medications were prescribed. Tr. 117-133, 540-557.

Roche was again hospitalized from January 17 to 21, 2016. Handwritten notes are illegible, but her mental status was check-marked as oriented in person, place, and situation, but not in time. She was hostile, evasive, distant and with poor level of attention and poor eye contact. She appeared unkempt. Her mood was anxious, depressed, irritable, and annoyed. Her affect was appropriate. Her speech was coherent but loud. She was having visual and auditory hallucinations, and suicidal ideas. Her introspection was average, her judgment poor, and she had a delayed motor activity. Her immediate, recent, and past memory were intact. Her GAF score was assessed at 35. Upon discharge, her mood was stable, and she did not have perceptual disturbances, or suicidal ideas. She was to continue psychiatric and psychological treatment.  Tr. 210-237, 717-745.

Roche continued outpatient treatment with Inspira from September 2016 to February 2017. By February 2017, Roche was still experiencing excessive anxiety and insomnia, and showed psychomotor retardation upon mental examination. Her mood continued to be depressed. She was oriented in time, place, and situation. Her form of thought was relevant, coherent, and logical. She showed no perceptual disturbances. Her memory was intact, and her judgment and insight were adequate. Tr. 802-823.

Roche was also hospitalized from May 17 to 23, 2017. Hospitalization summary indicates that Roche had a history of major depressive disorder treated with pharmacotherapy for the last five years, and was admitted because she was presenting deterioration of her depressive condition accompanied by suicidal ideas. She was stabilized and was to continue treatment. Tr. 270-278, 845-855.

## Ponce School of Medicine, Behavioral Health Division

Notes from June 2014 to April 2015 show treatment for depression and anxiety. On initial evaluation, she was diagnosed with major depressive affective disorder, simple episode, severe, and generalized anxiety disorder, and assigned a GAF score of 50. July 2014 psychiatrist notes indicate that Roche appearance was disheveled but had good eye contact. She was cooperative, and her motor activity was increased (not calm). Her mood was depressed and anxious, and her affect was constricted. Her speech was slow and soft.  Her attention was impaired. She was oriented in time, space, and person. Her thought process was circumstantial. In August 2014, Roche had suicidal thoughts and visual hallucinations. Her judgment was poor. She was referred for total psychiatric hospitalization. This record contains copies of the hospitalization at INSPIRA. Tr. 602-603, 631-636, 641-658, 713-715.

Handwritten notes from September 2014 to April 2015 are largely illegible, but indicate that she was doing slightly better, but still suffered from insomnia. Check-marked notes indicate that Roche's appearance was disheveled but with adequate hygiene. She had a depressed and anxious mood, and a constricted and irritable affect. She was cooperative, calm, and oriented. Her though process was circumstantial and tangential. She did not present suicidal or homicidal thoughts, or hallucinations. Her insight, judgment, and reliability were fair. Tr. 145-165, 604-658.

Notes from the Ponce Health Sciences University's Wellness Center, dated May 2016, show that Roche still suffered from fibromyalgia and neck pain, and was actively taking medications. She visited the center because she had difficulty managing her pain and anxiety. She appeared to be well-groomed and had adequate hygiene, was alert, calm and cooperative, her mood was euthymic, and her affect appropriate. She had no hallucinations. Her though process was coherent, and she did not have suicidal or homicidal ideation. As to insight, she acknowledged her problem. Her judgment was sound, her impulse control adequate, and her self-esteem appropriate. She was taught mindfulness meditation and educated about chronic pain. Tr. 833-844.

### *Procedural History*

Roche applied for disability insurance benefits on June 16, 2014, claiming disability starting July 9, 2013. Tr. 412-418. Roche claimed that she felt strong, sometimes intolerable, pain because of her fibromyalgia condition. She felt cramps in her hands and legs. Her knees hurt. She dropped objects from her hands and had difficulty performing manual tasks. She could not walk long distances or sit down or stand for prolonged periods of time, and any movement caused her

pain. She could walk ten minutes before needing to stop and rest. She could not use a phone because she heard buzzing in her ears. Emotionally, she was anxious, depressive, forgetful, afraid, and could not concentrate. She would forget spoken instructions and would get confused with written instructions. She got along with authority figures but being surrounded by people made her anxious. She handled stress with medications and could not get used to changes in her daily routine. Tr. 85-86, 90-91, 448-449, 453-454.

Her routine included getting out of bed with difficulty, going to the bathroom, eating breakfast and taking her medications. She had difficulty getting dressed, taking a bath, brushing her hair, shaving, chewing, and sitting and standing to use the toilet. She could not carry objects, cook, clean the house, drive, or handle funds. She would be around the house in pain, anxious, depressed, and unable to concentrate. Sometimes, she wanted to overdose, so her family would hide her medications from her. She could not stand being around people and did not want to go out. She wanted to sleep all day to forget about her pain, but her pain was intolerable, and she could not sleep. Tr. 86-90, 449-453.

The case was referred to Dr. Zulma Nieves, non-examining psychologist. On August 8, 2014, Dr. Nieves found that that the evidence on file showed very inconsistent psychiatric treatment and that, because the presence of a severe emotional disorder was recent, it could reasonably be expected that her condition could improve in twelve months if appropriate treatment is followed. Dr. Nieves assessed that Roche had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintain concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. Tr. 285-286.

The case was also referred to Dr. Lourdes Marrero, non-examining physician, who assessed on August 14, 2014, that Roche retained the ability to occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. Roche could stand and/or walk with normal breaks for four hours and sit with normal breaks for about six hours in an eight-hour workday. She could push and/or pull unlimited. Dr. Marrero assessed that Roche had no postural, manipulative, visual, or communicative limitations. Tr. 287-288.

The claim was denied initially on August 14, 2014, with a finding that Roche's conditions did not prevent her from working, and while her limitations affected her capacity to perform some

work-related tasks, considering her age, education, and work experience, she retained the capacity to perform light tasks but was not limited to unskilled work. Tr. 66, 279, 289, 309.

Roche requested reconsideration of the denial of benefits. Tr. 313. Roche did not allege changes in her conditions or new medical conditions. Tr. 458, 462.

An audiology consultative examination report by Dr. Mayra Burgos, dated March 10, 2015, indicates that Roche reported dizzy spells of long duration and with irritative symptoms, hearing difficulties and bilateral tinnitus, but on evaluation, Roche met bilateral borderline hearing thresholds, and recommended an annual hearing re-evaluation. Tr. 593-594.

A consultative psychological examination report by Dr. Yaritza Lopez, dated March 13, 2015, indicates that Roche's main complaint was directly related to her back condition as a precipitating factor for her depressed mood. Her main stressors were her economic problems and back condition. As to daily activities, Roche reported being able to care for her personal hygiene but received help to perform house chores. She watched television for entertainment. Roche denied having interpersonal problems, and got along well with family, friends, and neighbors. During the interview, Roche was calm and cooperative, made adequate eye contact, and had adequate psychomotor activity. She cried when talking about her medical condition. Her speech was coherent, relevant, and logical, and she established good rapport. There was no evidence of disorganized thought processes, delusions, bizarre behavior, or suicidal or homicidal tendencies. Roche was oriented in time, place, person, and circumstance. Her immediate, short-term, recent, and long-term memory seemed adequate. Her attention and concentration levels were appropriate. Dr. Lopez opined that Roche's prognosis is reserved. She showed some mood symptoms consistent with major depressive disorder, single episode, mild.  "At the time of the interview she shows adequate understanding, and capacity to concentrate; her overall memory seems on the average range for her age. She seems capable to perform several daily tasks, although might need assistance to complete others due to back condition. Marilu seems capable to initiate and sustain adequate social interactions and handle her funds." Tr. 595-601.

On April 7, 2015, Dr. Ramon Ruiz, non-examining consultant, adopted the previously proposed RFC as written. On March 24, 2015, Dr. Hugo Roman, non-examining physician, assessed that Roche had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation, each of extended duration. Dr. Roman

proposed a mental RFC of unskilled work because the claimant was depressed but still able to perform simple two-step commands, persist at tasks for two-hour intervals, interact with others, and adjust to changes. Tr. 299-306.

On April 9, 2015, the claim was denied on reconsideration, with a finding that while Roche's conditions caused limitations that affected her capacity to perform some work-related tasks that she used to perform, but that she could still perform other jobs, such as light or sedentary unskilled work. Tr. 70, 291, 307-308, 315. Roche requested a hearing before an ALJ (Tr. 320) and did not claim changes in her existing conditions or new conditions. Tr. 468, 472.

A video hearing before ALJ Gerardo Pico was held on June 16, 2017.[3] Tr. 36-51. Roche testified that she stopped working because she suffered from back and joint pain, fibromyalgia, vertigo, depression, anxiety, and lack of concentration. She took medications for her conditions, including Percocet, Neurontin, Sulindac, Cymbalta, and Klonopin. She also had pain blocks administered for her back condition. She had back surgery, but she was still in constant pain, enough to take away her desire to live. She had also been hospitalized for emotional crisis because she felt despair for not being able to get over or accept her pain, and because she felt useless. Roche didn't cook because she could not concentrate but could wash dishes. Her daughters took care of her and her husband, gave Roche her medicines, and did the house chores. She needed help taking a bath because she lost her balance and her joint pain made it hard to wash her body and hair. Tr. 40-45.

A vocational expert ("VE"), Jeffery W. Lucas, testified that Roche's previous work as a mortgage loan interviewer was a sedentary job with a Special Vocational Preparation ("SVP") of six, classified as expert work. Roche also worked as bank teller, which was a light job, SVP of five. The ALJ asked the VE if a hypothetical person with the same vocational profile as Roche who was limited as follows could work: lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; and sit six hours in an eight-hour workday but stand and/or walk four hours in an eight-hour workday. The VE answered that such a person could perform the loan interviewer job but not the teller job. The VE added if such a person could do these jobs if the person was limited to simple tasks and maintain attention and concentration for two-hour intervals at a time. The VE answered that such a person could not.

_____

[3] Roche, represented by Attorney Oscar Crespo, appeared in Ponce, Puerto Rico. ALJ Pico presided from Columbia, Missouri.

The ALJ then asked if such a person could do any job, and the VE answered that such a person could work as router (53,000 jobs available in the national economy), marker (272,000 in the economy), and rental clerk (45,000 in the economy), all light simple jobs. Counsel for Roche added if such a person additionally needed scheduled breaks every hour for fifteen to twenty minutes, could she perform the proposed jobs. The VE answered no. Counsel asked if instead she had to sit and stand at will, could she perform those jobs. The VE answered that she could do the router and rental clerk jobs, and "for marker, I need [INAUDIBLE 00:30:43], so, there's 136 in the economy." (Tr. 48). Counsel asked if such a person could occasionally use the upper and lower extremities, could she do the three proposed jobs, and the VE answered no. The VE further explained at the ALJ's request that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), with exception of additional breaks and maintaining attention and concentration, which was based on his education, experience and thirty-six years in the profession. Tr. 45-49.

On August 29, 2017, the ALJ found that Roche was not disabled under sections 216(i) and 223(d) of the Act from her alleged onset date of July 9, 2013. Tr. 14-35. The ALJ sequentially found that Roche:

(1) had not engaged in substantial gainful activity since her alleged onset date (Tr. 22);

(2) had severe impairments which caused more than minimal functional limitations in her ability to perform basic work activities: degenerative joint disease, degenerative disc disease with related surgery, peripheral neuropathy, and depression (Tr. 22);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 23);

(4) retained the RFC to perform a reduced range of light work[4]: she could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, and could sit for 6 hours and stand and/or walk for 4 hours in an 8-hour workday. Roche had to be allowed to alternate positions from

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Individuals capable of performing light work can also perform sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

sitting and standing at will. She could also perform simple tasks and keep attention and concentration for 2-hour intervals (Tr. 24). Therefore, she could not perform past relevant work (Tr. 28); but

(5) as per her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Roche could perform, such as router, marker, and rental clerk (all light unskilled work with an SVP of 2). Tr. 29.

The ALJ found that under SSR 85-28, Roche's severe conditions caused more than minimal functional limitations in her ability to perform basic work activities, but that under Social Security Ruling 12-2p Roche did not present sufficient documentary evidence to establish that her alleged fibromyalgia was a medically determinable impairment. Tr. 22. The ALJ also found that Roche's mental impairment does not meet or medically equal the criteria of listing 12.04. Tr. 23. The ALJ considered that Roche's testimony regarding her psychological symptoms were consistent with her treatment record, as per 20 CFR 404.1529, and SSRs 96-7p and 85-15. Tr. 27.

The ALJ considered Roche's pain allegations resulting in functional limitations, and found "no evidence of severe muscle weakness, atrophy, deformity, swelling, marked tenderness, marked spasm, joint stiffness, significant range of motion limitations, and/or sensory and motor deficits." The ALJ also considered Roche's medication tract, and the lack of need for prolonged physical therapy or any further surgical intervention. Tr. 26-27.

The ALJ afforded little weight to Dr. Ruben Rivera's extensive report because it was mostly based on Roche's complaints and as to the effect of pain on patients and studies on depression in general. The ALJ awarded some weight to Dr. Alberto Rivera's  opinion because the limitations against prolonged standing and ambulating were supported by the record and were added to the RFC assessment in the ALJ's opinion, but there was no examination that supported a limitation on bending. The ALJ also considered Roche's use of opiates, which limited her to simple tasks. Tr. 27. The ALJ afforded little weight to the GAF scores throughout the record because they provided a "snapshot of functioning at a particular moment in time, have limited relevance to a person's long-term work abilities and limitations, and are not standardized and not designed to predict outcomes." Tr. 27-28. The ALJ also afforded little weight to the state agency consultant Dr. Zulma Nieves's opinion that Roche's mental health condition was non-severe because the evidence supported greater limitations. The ALJ afforded state agency consultants Dr. Hugo Roman, Dr.

Lourdes Marrero, and Dr. Ramon Ruiz great weight because their opinions were consistent with the record as a whole. Tr. 28.

On February 3, 2019, the Appeals Council denied Roche's request for review, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1. The present complaint followed. Docket No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Roche's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act.

Roche claims that the ALJ's physical RFC finding is faulty. The Commissioner maintains that substantial evidence supports the ALJ's decision. I note that Roche makes no arguments as to her mental conditions. I must point out that while the claimant phrased her first argument at page 5 of her memorandum at Docket No. 22 that the Commissioner erred in the RFC assessment, and summarized some evidence of her physical conditions on pages 6-9, the arguments presented and developed were not about the RFC finding being faulty, other than the issues addressed below.[5]

*Sit and stand option:*

The ALJ determined that Roche retained the RFC to perform a reduced range of light simple work, with the ability to keep attention and concentration for 2-hour intervals. Light works involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds (20 C.F.R. § 404.1567(b)), which is what the ALJ assessed Roche could do. Light work also "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ALJ limited Roche's ability to sit to six hours and stand and/or walk for four hours in an 8-hour workday. She also had to be allowed to alternate positions from sitting and standing at will.

RFC is an administrative assessment of a claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments, to be determined solely by the ALJ. 20 C.F.R. §§ 404.1520(e), 404.1527(d)(2), 404.1545(a)(1), and 404.1546; SSR 96-

---

[5] "'It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Harriman v. Hancock Cnty.*, 627 F.3d 22, 28 (1st Cir. 2010) (*quoting United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

8p. But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* The ALJ must weigh all the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 28, 224 (1st Cir. 1981). However, the claimant is responsible for providing the evidence of an impairment and its severity; and the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (*citing Richardson v. Perales*, 402 U.S. 389 (1971)).

Also, the ALJ here obtained the testimony of a VE "[t]o determine the extent to which [Roche's additional] limitations erode the unskilled light occupational base." Tr. 29. The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1).

According to the DOT Appendix C(IV)(A), as cited by Roche, standing is defined as being on one's feet in an upright position without moving. Roche claims that this definition eliminates the option of alternating between standing and sitting at will because frequent lifting and carrying for light work require being on one's feet up to two thirds of the workday, meaning she'd have to stand for up to approximately six hours of an eight-hour workday. Roche argues that because this limitation eroded the occupational base, the ALJ, when assessing the RFC for sitting and standing, relied on the VE's testimony instead of the DOT's definition of standing, but "did not explain the apparent conflict between the DOT and the VE's assessment as required by SSR 00-4." Docket No. 22 at 10.

SSR 00-4p allows a VE to provide more specific information about occupations than the DOT, including information based on the VE's professional experience. 2000 SSR WL 1765299. "When offering testimony, the experts may invoke not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (*quoting* SSR 00-4p). When this happens, the ALJ must elicit from the VE a reasonable

explanation for any conflict between the VE's testimony and the DOT and explain the resolution of the conflict in the decision. *Id.*

Various courts interpret SSR 00-4p as requiring the ALJ to do more than ask the VE if a conflict between the DOT and the VE's testimony exists, but to obtain a reasonable explanation for an apparent conflict, too, as part of the ALJ's duty to develop the record. *See Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353 (11th Cir. 2018); *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015); *Massachi v. Astrue*, 486 F.3d 1149 (9th Cir. 2007). We must distinguish this from information not found in the DOT. SSR 004-p "makes clear that before relying on VE evidence, adjudicators must 'identify and obtain a reasonable explanation for any conflicts between' such evidence and the DOT. … But it does not impose a duty on the ALJ to obtain a reasonable explanation when the VE simply testifies to information not found in the DOT – but that does not conflict with it." *Courtney v. Comm'r, SSA*, 894 F.3d 1000, 1003 (8th Cir. 2018). "[U]nless a VE's testimony appears to conflict with the DOT, there is no *requirement* that an ALJ inquire as to the precise basis for the expert's testimony regarding extra-DOT information." *Id.* at 1004.

The ALJ addressed the limitations on sitting and standing both at the hearing and in the decision. Let's review those.

Claimant's representative at the hearing asked the VE if the claimant could perform the jobs of router, marker, and rental clerk if she had to sit and stand at will. The VE answered that such a person could do the router and rental clerk jobs, as available in the national economy, but as to the 272,000 marker jobs, "I need [INAUDIBLE 00:30:43], so, there's 136 in the economy."[6] Tr. 48. The explanation offered as to why there are fewer jobs for the marker position with the sit/stand limitation is unavailable in the transcript as it appears to have been inaudible for transcription.

The ALJ then asked the VE if his testimony was consistent with the DOT, to which the VE answered that his testimony was consistent with the DOT, with exception of additional breaks and maintaining attention and concentration, which was based on his education, experience and thirty-six years in the profession. Tr. 49. The VE did not mention that his testimony as to sitting and standing was inconsistent with the DOT or not addressed in the DOT. The ALJ explained in the

---

[6] While 50 percent of 272 is 136, and half of 272,000 is 136,000, as also discussed by the Commissioner, the decision reads "the vocational expert testified … the individual would be able to perform the requirement of representative occupations such as a … marker … with 336,000 such jobs in the national economy …" Tr. 29. This could very well be a typo.

decision that "the vocational expert's testimony was consistent with the information contained in the D.O.T., except for the consideration of the sit or stand option, which is not addressed in the D.O.T. That testimony was based on the vocational expert's education and field experience, and thus is a reliable source of occupational information appropriate for consideration under Social Security Ruling 00-4p. The numbers for the marker position have been reduced per the vocational expert's testimony that a sit/stand option would reduce the number of positions available by 50 percent." Tr. 29. No further explanation is offered.

Even without the benefit of that inaudible VE testimony at the hearing and even further assuming there is a conflict in the testimony, while keeping in mind that the ALJ was not required to inquire as to the precise basis for the expert's testimony regarding extra-DOT information, I find that the ALJ's failure to address any disparity between the DOT definition for standing and the VE's testimony is harmless error. "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.' "*Molina v. Astrue,* 674 F.3d 1104, 1115 (9th Cir. 2012) (citations omitted). The VE testified that the limitation to sit and stand at will did not affect the router and rental clerk jobs as available in the national economy. The ALJ incorporated this limitation into the RFC. As a result, Roche suffered no prejudice from the ALJ's error and remanding this case for further elaboration would serve no additional purpose. *See United States* v. *Scott*, 270 F.3d 30, 46 (1st Cir. 2001) ("Even if we find error, we will not reverse if the error was harmless.").

*Opinion Evidence Discrepancy*

The other argument raised by Roche is that the ALJ did not explain in his findings why he favored one the state agency medical consultants' physical RFC assessment over the other. Roche claims that Dr. Marrero assessed at the initial level that Roche retained the RFC to perform light work, while Dr. Ruiz assessed at the reconsideration level that she was limited to sedentary work, and that the ALJ chose to adopt Dr. Marrero's assessment. This is simply not true. The record reads clear: Dr. Ruiz adopted the proposed RFC as written at the initial level. I therefore find that this claim is without merit.  No further arguments were raised by Roche as to the weight assigned to the medical experts.

Going back to the RFC finding in general, while reviewing the transcript to decide upon claimant's arguments and the Commissioner's responses, it is abundantly clear, as summarized in this opinion, that Roche has been treated by a potpourri of doctors for her physical and emotional

conditions. Even after receiving numerous treatments and follow-up care from her treating physicians, some of her main complaints of pain and emotional conditions remain present. It is also clear to me that the ALJ considered Roche's pain complaints and daily activity limitations; evidence from the treating, consultative, and non-examining physicians; and the VE's testimony in assessing Roche's physical and mental functional capacity. The ALJ's summary of the treating, examining, and consultative opinions considered, and the ALJ's specific statement of the reasoning behind the weight assigned shed light as to the reasoning behind the RFC finding in this case.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987). After thoroughly and carefully reviewing the record, I find that the errors raised by the claimant were either harmless or meritless, and that there is substantial evidence to support the ALJ's RFC finding. The decision is therefore affirmed.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of March, 2021.


*s/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge